## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **CITY OF LAWTON, OKLAHOMA,**<br>**a municipal corporation,** | |
| Plaintiff, | |
| v. | Case Number: CIV- 21-455-R |
| **ENGIE SERVICES, U.S., INC,**<br>**f/k/a OpTerra Energy Services, Inc.,** | |
| Defendant. | Jury Trial Demanded |

## COMPLAINT

Plaintiff City of Lawton, Oklahoma, a municipal corporation ("City"), for its Complaint against Defendant Engie Services, U.S., Inc. ("Engie"), states as follows:

1. City is an incorporated town in Comanche County, Oklahoma, and citizen of the state of Oklahoma.

2. Defendant Engie, formerly known as OpTerra Services, Inc. ("OpTerra"), is a Delaware corporation, with its principal place of business outside the state of Oklahoma and believed to be in France.

3. Plaintiff City brings its Complaint against Defendant Engie, alleging two causes of action, each for damages in excess of $75,000.00.

4. Based on the averments set forth in this Complaint, this Court has subject matter jurisdiction based on diversity.

**I.     General Allegation of Facts.**

**A. <u>The Contract & Amendments 1-3.</u>**

1

5. This lawsuit is based on a contract and three amendments thereto, but the scope of this litigation focuses on issues related to Amendment No. 3 (Exhibit "1" hereto); said Amendment No. 3 having been approved by City's governing body [i.e., city council] on February 28, 2017.

6. The original contract (Exhibit "2" hereto), which was between City and Chevron Energy Solutions Company, a Division of Chevron U.S.A., Inc. ("Chevron"), and approved by the city council on February 5, 2008,  included in its original scope of work various projects consisting of such things as: (1) water meter replacement and fixed base AMR; (2) lighting retrofits; (3) energy management system installation/upgrade; (4) installation of programable thermostats; (5) replacement of aging packaged units; (6) conversion of induction system to VAV with hot water reheat; (7) conversion of dual-duct system to VAV; (8) installation of waste-oil heaters; (9) modifications to influent pumping systems; (10) nitrification aeration control; and (11) replacement of fine bubble diffusers.

7. On or around August 10, 2010, the city council approved Amendment No. 1 (Exhibit "3" hereto) to the contract. Amendment No. 1 expanded the scope of work to be performed by adding such projects as: (1) an energy management system installation/upgrade for McMahon Auditorium; (2) replacement of aging boilers at the police station and town hall buildings; (3) replacement of aging chillers at the police station; (4) replacement of aging split systems with high efficiency units at Fire Station No. 7, HC King Center, Patterson Center and Town Hall.

8. On or around October 27, 2015, the city council approved Amendment No. 2 (Exhibit "4" hereto) to the contract. Amendment No. 2, in addition to approving the assignment of the contract from Chevron to OpTerra, authorized the commencement of an audit to identify potential future projects, to include transitioning to a VOIP phone system and upgrading City's data network.

9. As stated in Paragraph 5 above, on February 28, 2017, City and OpTerra entered into Amendment No. 3 of the contract, calling for OpTerra to, among other things, design, supply, and install a new data network, a VOIP (Voice Over Internet Protocol) phone system, and virtual servers for City. Amendment No. 3 also provides for a guaranteed cost savings to City, pursuant to 62 Okla.Stat. Sec. 318, and requires City be reimbursed annually for any shortfall in guaranteed savings. Those are the contractual duties at issue in this lawsuit.

10. During the course of the contract, OpTerra was acquired by Engie and became known as Engie Services, U.S. Inc. Engie thereafter became responsible for OpTerra's obligations under the contract, to include those obligations set forth in Amendment No. 3.

11. Accordingly, Engie is party to the contract, including Amendment No. 3, the same as if Engie had signed it.

12. Similarly, Engie is liable for all the prior actions of OpTerra performed under Amendment No. 3 of the contract as if Engie had performed them.

13. As such, Engie assumes the responsibilities, duties, and obligations of OpTerra under the contract, to include Amendment No. 3.

14. The work called for in Amendment No. 3 of the contract had a total contract price of $2,868,352.

15. Under the terms of the contract, final completion of the work set forth in Amendment No. 3 was to have been six months after notice to proceed was given. After Amendment No. 3 was executed, notice to proceed was subsequently issued, with Engie thereafter identifying a completion date of October 15, 2017.

**B. The Scope of Work of Amendment No. 3.**

16. The Scope of Work for Amendment No. 3 of the contract is set forth in Attachment D thereof.  That Scope of Work includes 11 items of work, broken down into 5 larger categories:  Technology, Architecture, Lighting, Controls and Mechanical:

| Item No. | Category | Description |
|---|---|---|
| | Technology | |
| 1 | | T1 – Upgrade Data Network |
| 2 | | T2 – VOIP (Voice Over Internet Protocol phone system) |
| 3 | | T3 – Server Virtualization |
| | Architecture | |
| 4 | | A1 – Install New Vestibule |
| | Lighting | |
| 5 | | L1 – Exterior LED Lighting at City Facilities Building |
| 6 | | L2 – Exterior LED Lighting at City Facilities Site/Area |
| | Controls | |

4

| 7 | | C1 – Fiber Optic Cable and Control System Upgrades |
|---|---|---|
| 8 | | X1 – Retro-commission Administration Building |
| | Mechanical | |
| 9 | | M1 – Replace Aging Chillers |
| 10 | | M2 – Replace Aging Boiler |
| 11 | | M3 – Repair Perimeter Heating Grilles |

17. Only the Scope of Work in the first category (Technology) includes the three items that, in addition to the required guaranteed savings, are the immediate subjects of this lawsuit.  Those three items, which are highlighted in yellow above, are:

- ■ T1 – Upgrade Data Network,

- ■ T2 – VOIP (Voice Over Internet Protocol phone system), and

- ■ T3 – Server Virtualization.

18. The work in items T1, T2 and T3 comprised $1,092,495 of the total $2,868,352 increase in the contract amount due to   Amendment No. 3, as scheduled below:

| | |
|---|---|
| Upgrade Data Network – City-Wide (Equipment): | $234,333 |
| Upgrade Data Network – City-Wide (Installation): | $234,333 |
| VoIP System – City-Wide (Equipment): | $182,226 |
| VoIP System – City-Wide (Installation): | $182,226 |
| Server Virtualization – City-Wide (Equipment): | $155,026 |
| Server Virtualization – City-Wide (Installation): | $103,351 |
| Total: | $1,092,495 |

19. The gist of Engie's Scope of Work as it related to the T1, T2, and T3 items was to take an antiquated data network and phone system and modernize the same.  Such

modernization included: (1)  providing a new network that (a) would fully support IP voice traffic (internet phone communications), (b) provide a reliable transport for City's non-VOIP applications, as well as (c) provide redundancy that did not exist in City's pre-Contract network; (2) replacing where possible City's antiquated land-line phone system with an internet VOIP phone system to eliminate long distance charges (reduce costs) and provide more functionality, and (3) virtualizing City's servers to reduce IT expenses, increasing reliability and efficiency.

### 1. Upgrading the Phone System

20. City's pre-existing landline-based phone system had been in use for over thirty years. That system, which utilized copper wiring, Plexar software/hardware and standard handsets was by 2017 becoming difficult to support due to its age, thereby increasing the costs for continued maintenance of the system.

21. By 2017, many businesses were moving to voice over IP (internet) phone systems as a more cost-efficient alternative to copper-based landline phone systems. Voice over IP systems offer bundled services (i.e., call feature functionality, long distance, video conferencing, voice to email and applications to utilize cellular phones) at a reduced price when compared to the traditional landline phone system.

22. By 2017, City was paying a significant amount of money annually for phone service. Amendment No. 3 of the contract, in identifying potential cost saving measures, indicated that City was paying approximately $14,437.00 per month (i.e., $173,244.00 annually) for its landline phone services. In addition, Amendment No.

3 also indicated City's average long-distance bill was, in the twelve months prior to the amendment's execution, $2,959.00 per month (i.e., $35,508.00 annually).

23. Amendment No. 3 of the contract guaranteed a reduced phone cost to City by replacing its Plexar phone system with a VOIP system. The cost of the VOIP phone upgrade, including all of the necessary hardware and the full installation thereof, was to be $364,452.00 under Amendment No. 3.

24. Amendment No. 3 of the contract provided that the annual cost for implementing the VOIP phone system would be $38,492.00 (i.e., $3,207.70 per month). Amendment No. 3 also provided that by implementing the VOIP phone upgrade City would realize a net monthly savings of $15,965.00.  The VOIP phone project guaranteed a significant savings to City in the costs of City telephone services when compared to the $173,244.00 annual cost of the old Plexar system, in addition to the elimination of the then-average monthly long-distance bill of $2,959.00 (i.e., $35,508.00 annually).

25. Accordingly, the Scope of Work for "T2 – VOIP" called for Engie to supply and install a "hosted, software-based solution to provide unified messaging solutions and a replacement for the current outdated Plexar phones."  That replacement was to be the VOIP telephone system, and it was contractually defined and described as such at page 19 of Amendment No. 3 of the contract.  The price for the VOIP phone system under Amendment No. 3 was $364,452.00.

**2. Upgrading the Data Network**

26. In conjunction with upgrading City's phone system, City also contracted as part of Amendment No. 3 for Engie to upgrade City to a new computer data network. The purposes of upgrading to a new network were: (1) to have a network that would fully support IP voice traffic (internet phone communications), as well as provide a reliable transport for City's non-VOIP applications, and (2) to implement a network that provided redundancy that did not exist in City's pre-contract network.

27. "Data" as it is used in the term "Data Network" means information that is digitized into "0s" and "1s" for computation, transmission and/or storage purposes.  The "0s" and "1s" in the data can carry VOIP telephone calls, i.e., sounds are transmitted as "data" while carried over the internet, then decoded back into the sound of the telephone caller's voice when the data transfer is complete.  Other examples of data are emails, PDF's, Excel spreadsheets, Word documents, photos, videos, drawings, and plans that are digitized and stored electronically.

28. In order for City to effectively utilize and share digital data it needs a Data Network.  For purposes of Amendment No. 3, the Data Network is not the individual computers on the desks of City workers.  Those individual computer workstations were NOT part of the replacement and upgrade that City hired Engie to provide.  The "Data Network" is the interconnection between the computers of City employees, together with their interface with the internet.

29. Accordingly, the T1 "Upgrade Data Network" component of Amendment No. 3 at page 9 required Engie to design, supply and install a "data network solution" that "will fully support IP voice traffic, as well as provide reliable transport for City's

non-VOIP applications." The "IP voice traffic" means the VOIP phone system. The "non-VOIP applications" are all the other "data" transmissions – emails, PDF's, Excel spreadsheets, Word documents, photos, videos, and drawings, plans, etc. that City workers utilize in the course of their duties.

30. Importantly, the data network upgrade contracted for in Amendment No. 3 did NOT involve changing computers at any City workers' workstations. Those existing computers would remain, but they would be interconnected by a series of new switches and routers to be provided and installed by Engie, as well as fiber-optic cable that would allow the speedy transmission of "data" – things like email, pdf's, Excel spreadsheets, Word documents, photos, videos, and voice phone calls -- between the various workers at their workstation computers.

31. Accordingly, that first Scope of Work in Amendment No. 3 (T1 – Upgrade Data Network) did not call for Engie to supply any individual computers for City workers, but instead on page 11 required Engie to provide the network hardware needed to upgrade the mechanisms by which City's computers were interconnected, i.e., it required Engie to provide a new system of switches and routers as well as a reconfigured Data Network. Those itemized pieces of equipment were:

■ 47 Cisco Data Switches plus 5 additional spare Cisco Data Switches, and,

■ 17 Cisco Routers, plus 3 spare Cisco Routers.

Those switches and routers were the "Data Network" components needed to interconnect City workers' computers with the servers that stored City's data and with the routers that would interconnect City workers' computers with each other

and with the internet at large.  These switches and routers were equipment that comprised the "Data Network" Engie was selling to City.

32. The cost component of Amendment No. 3 of the contract for this T1 – "Upgrade Data Network" project was $468,666.00 for equipment and installation.

33. Additionally, the Data Network Engie designed included, as shown on page 12 of the Third Amendment, a "Proposed Internet Service Solution" providing for the installation of three fiber-based internet circuits: one at the City Hall Annex, one at the Emergency Operations Center and another at the Public Works Complex, with the Public Works Complex to have a 50Mb data speed. Fidelity Cablevision, Inc. [aka Fidelity] was the company identified in the Third Amendment to "build out their fiber-based internet services to the Emergency Operations Center and Public Works Complex within 30-45 days of receiving a signed service agreement."

34. Following the execution of the Third Amendment, City -- acting in good faith in conformance with the provisions of the Third Amendment --  entered into a Master Services Agreement with Fidelity on or around April 11, 2017, which included in the service order with Fidelity "Dedicated High Seed Internet Access (HSIA) – HSIA ETHER: 50MBPS/50MBPS" for 2100 SW 6th St Lawton OK 73501 (WWC/WWM Division Bldg. #16) [aka the Public Works Complex] for 60 months at a rate of $685.00 per month.

### 3. Server Virtualization

35. The final element of the Scope of Work involved in this lawsuit (so far) is "T3 – Server Virtualization" as listed in the table at paragraph 16 above.

36. In this context, a "server" is a computer that serves to store data. Such data includes applications and programs. Thus, "data" can be and is stored on an individual City worker's computer, but a "server" is a computer uniquely dedicated to storing "data," particularly voluminous data that includes various applications and programs. In 2017, before the Data Network Upgrade, City had 21 different on-site computers acting as servers.

37. Under the Scope of Work element "T3 – Server Virtualization," the 21 on-site servers would be virtualized, thus reducing the number of on-site physical servers necessary. Additionally, some of the old servers would be repurposed and taken to a third-party vendor's facility [Quasar Data Center] in Houston, TX, to be used to provide backup and disaster recovery infrastructure for City. To achieve this, Amendment No. 3 at page 23 called for Engie to design, purchase and install a system that would include:

   ■ "Three (3) Computer nodes will be procured and will host all Virtual Machines for Lawton's virtual environment."

   ■ "Four (4) Gigabit switches will be procured and will provide internet connectivity for Lawton's virtual environment."

   ■ "One (1) 2-node NetApp storage array will be procured to provide data storage for Lawton's virtual infrastructure."

## C. __The cost savings Engie guaranteed in Amendment No. 3__

38. The elimination of the AT&T telephone bills, the elimination of the maintenance on 21 servers, and many other aspects of the Technology portion of Amendment No. 3 was projected by Engie to cause a reduction in operating costs of City's Computer Network, telephone, and data storage system.

39. Accordingly, in Amendment No. 3 of the contract at page 3, Engie gave City an express guarantee of cost savings.  It states:

> OpTerra ES [now renamed Engie Services U.S., Inc.] shall guarantee the costs savings for each year of the term of the agreement.

40. Amendment No. 3 at page 3 goes on to recite:

> Any provision of the original agreement or any of the subsequent amendments contrary to this provision shall be null and void and have no force or effect.

41. Amendment No. 3 of the contract is now into its fourth year, and page 53 of Amendment No. 3 provides for the following "Guaranteed Savings" during each of the first four years following the execution of the amended contract:

| Year | Total Program Savings | Cumulative Total Program Savings | Total Program Costs | Guaranteed Savings | Cumulative Guaranteed Savings |
|------|----------------------|----------------------------------|---------------------|--------------------|-------------------------------|
| 1 | $356,609 | $356,609 | -($206,600) | $150,009 | $150,009 |
| 2 | $361,019 | $717,628 | -($206,600) | $154,419 | $304,428 |
| 3 | $365,500 | $1,083,128 | -($206,600) | $158,900 | $463,328 |
| 4 | $370,051 | $1,453,179 | -($206,600) | $163,451 | $626,779 |

Thus, the Guaranteed Savings through the first four years of Amendment No. 3 should have totaled $626,779. During the remaining 11 years of the 15-year period

Amendment No. 3, the contract requires an additional $3,056,596 of Guaranteed Savings to be realized.

   D. **Facts related to Engie's default and subsequent breach of the contract concerning the data network and VOIP phone system**

42. Amendment No. 3 of the contract at page 11 calls for the T1 "Upgrade Data Network" to design, procure and install a Data Network utilizing 47 Cisco-brand Data Switches and 17 Cisco-brand routers, plus 5 "spare" Cisco-brand Data Switches, and 3 "spare" Cisco-brand routers.

43. Cisco-brand equipment is regarded as the top-of-the-line in quality, sometimes referred to as a "Cadillac" brand of Data Network equipment.

44. After the city council's February 28, 2017, approval of Amendment No. 3 of the contract, and after the parties had subsequently signed the amended contract, Engie informed City that the Cisco dealer whom Engie had planned to use to supply the Cisco equipment had decided not to supply the equipment.

45. Rather than procure the contractually required Cisco-brand equipment from one of the other 46 Cisco dealers in the United States, as listed on Cisco "partner locator" webpage

   (https://locatr.cloudapps.cisco.com/WWChannels/LOCATR/openBasicSearch.do;jsessionid=8CDF9284D014CFF911CB8E6F81812619), Engie instead represented to City that AdTran-brand switches and routers would provide equivalent quality.

46. City relied on Engie's representation; after all, Engie was the expert company hired to design, procure, and install the Data Network.  Furthermore, the contract was

never amended to substitute the contractually agreed upon Cisco equipment for AdTran equipment.

47. Engie's representation of the AdTran equipment being of equivalent quality was false.

48. Many months into the project, when the AdTran-brand switches and routers (in lieu of the Cisco-brand switches and routers) were being installed and tested, the AdTran-brand switches and routers were repeatedly failing to perform, due to a variety of problems.

49. Then, also many months into the project, it was discovered that the AdTran-brand routers that Engie had caused to be delivered and installed did not provide the same security against hacking and viruses that is provided by the Cisco equipment City contracted to receive in Amendment No. 3.

50. Cisco-brand routers provide SHA-2 security.

51. The AdTran-brand routers delivered to City for its new data network did not, as of January 2018, offer SHA-2 security. Rather, the AdTran-brand routers City received provided an inferior level of security, i.e., SHA-1.

52. Since 2005, SHA-1 has not been considered secure against outside threats to computer networks. In 2017 all major web browsers ceased acceptance of SHA-1. At the time of Amendment No. 3 of the contract, the State of Oklahoma security standards did not allow City to operate under SHA-1 because of the danger that City's data network could be hacked by an outside entity.

53. This inferiority of the AdTran equipment was unknown to City at the time that Engie represented to City that the AdTran-brand switches and routers would deliver an equivalent level of quality as the Cisco-brand switches and routers Engie had contractually agreed to provide.

54. On the other hand, Engie was the expert hired to design, procure, and install the Data Network.  The inferiority of the AdTran-brand switches and routers, as compared with the contractually required Cisco-brand switches and routers, was known, or should have been known to Engie at the time Engie represented them to be of equal quality.

55. If Engie did not know of the inferiority of the AdTran-brand switches and routers, as compared with the contractually required Cisco-brand switches and routers, then Engie negligently performed its design duties under Amendment No. 3 of the contract.

56. Once the inferiority of the security of the AdTran-brand routers due to their failure to provide SHA-2 security was discovered by City, City raised this issue with Engie. Engie investigated the issue and reported back that AdTran did not have the capability to provide SHA-2 security on its routers.  The best AdTran could offer was that perhaps in 12 to 18 months its engineers could develop the capacity to deliver SHA-2 security on its routers.

57. Thereafter, Engie recommended the removal of the AdTran-brand routers, with the same to be replaced at Engie's expense with Juniper-brand routers.  Thus, Engie's collective recommendation was to keep the already-in-place AdTran-brand

switches, but to substitute in Juniper-brand routers for the existing AdTran-brand routers.

58. Again, Engie, as the Design Engineer of the project, represented to City that the Juniper-brand routers would be equivalent to the Cisco-brand quality required by Amendment No. 3 of the Contract.

59. City relied on Engie's representation, after all, Engie was the expert company hired to design, procure, and install the Data Network.

60. Engie's representation was false.

61. Engie procured and caused to be installed the Juniper-brand routers.  The Juniper-brand routers began arriving in September 2018.  This was approximately 11 months <u>after</u> the contractually required October 15, 2017 completion date.  The Juniper routers Engie installed were underrated.

62. The new hybrid network of AdTran-brand switches and Juniper-brand routers Engie designed and installed was plagued from the beginning with problems. In addition to the security issue, the network did not provide the level of service that was promised, to include network performance / bandwidth.  At multiple locations throughout City the data speed promised was not being achieved. Amendment No. 3 promised a 30mb speed at both City's Southeast Water Treatment Plant and the Wastewater Treatment Plant. However, that speed was not being achieved. Additionally, the data speed at City's Public Work's yard was also insufficient.

63. City subsequently took the initiative and purchased three higher quality Juniper routers and one backup router at its own cost in an attempt to remedy the deficiency

from the underrated Juniper routers Engie installed.  However, despite this action by City, the issues with Engie's hybrid network continued.

64. Meanwhile the VOIP phones had been procured by Engie as required by Amendment No. 3 of the contract and, during the winter of 2018-19, ongoing attempts were made to connect the first 20 VOIP test phones to the hybrid Data Network consisting of AdTran-brand switches and Juniper-brand routers.

65. However, when the first 20 VOIP phones were connected to the new hybrid network of AdTran switches and Juniper-brand routers to serve as test phones, these VOIP phones did not consistently work over the new network. There were regular ongoing connectivity issues where the VOIP phones would not stay registered.  As a result, frequent dropped calls occurred.  There were also ongoing issues with call quality.

66. As a result of the VOIP phone connectivity issue, one "solution" proposed in the first quarter of 2019 by Engie's contracted phone system installer was to bypass the new hybrid network's security in an attempt to stabilize the phone system so the VOIP phones would stay connected and work on the network. Essentially the proposal was to run the VOIP phones into the hybrid network through a back-end connection (NEV device). This proposed "solution" was an attempt by Engie's contracted phone installers to work around the hybrid network's inability to support the phones. The problem with this work around is that it would have further affected the security of the hybrid network as it could allow others to also bypass network security and come through this back door into the network without anyone's

knowledge. City considered this proposed "solution" unacceptable and did not allow it to be implemented.

67. After the execution of the Third Amendment, City, in preparation of the VOIP phone system becoming operational and in reliance on Engie's representations that the VOIP system would be ready and work as contractually promised, began preparing for the conversion to VOIP phones by not renewing its service agreements with AT&T, agreements that would no longer be needed once the conversion was complete.  Hence, as the AT&T service agreements expired, City in expectation of the VIOP phones coming online shortly, did not renew the agreements for new yearly terms, but rather went to temporary month-to-month service with AT&T. The expiring AT&T service agreements caused City's monthly phone bill to increase to in excess of $20,000 per month.

68. By the Spring of 2019 it became apparent to City the hybrid data network Engie caused to be procured and installed was inadequate and not the product City had contracted to receive. Additionally, it was also apparent that the 20 VOIP test phones were consistently failing to stay connected to the hybrid data network. City, on or around May 17, 2019, provided Engie a notice of default, setting forth the known deficiencies at that time with Engie's performance under Amendment No. 3 of the contract, to include the issues with the hybrid data network and VOIP phones.

69. After receiving City's May 17, 2019 notice of default letter Engie failed to assume any responsibility for the deficiencies with the aforementioned hybrid data network or the ongoing connectivity and quality issues with the 20 VOIP test phones.

70. Due to necessity, City by this time had also taken steps on its own to address the deficient hybrid data network Engie installed.  Such steps included engaging a consultant to assess Engie's hybrid network to ascertain whether it could be salvaged, and when it was determined it was not salvageable, design and install another data network, i.e., the Unified Data Network, at a cost of approximately $1.1 million.

71. Despite the connectivity issues with the 20 VOIP test phones in 2018 and early 2019, Engie continued to make assurances after receiving City's notice of default that it was ready to proceed with the implementation of the VOIP telephone system. Based on these assurances City allowed Engie in October 2019 to proceed with implementation of the VOIP phone system on the hybrid data network that Engie had caused to be procured and installed.  The late 2019 implementation attempt, like earlier attempts, was plagued by ongoing connectivity issues, frequent dropped calls, and call quality issues. Engie performed tests but could not get the VOIP phone system (that Engie designed, procured, and installed) to work over the hybrid Data Network (that Engie designed, procured, and installed).

72. In a final effort to achieve the VOIP phone system Engie contracted to provide, City in late 2019 allowed Engie to attempt to implement the VOIP phones on City's newly acquired Unified Data Network. However, Engie's ability to implement VOIP phones on City's Unified Data Network was also plagued with issues. During the porting of the initial 45 numbers for just one City building [City Hall Annex] onto the Unified Data Network, personnel from Engie's VOIP/SIP provider were

unable to figure out how to make phones at different extensions communicate with each other.  Engie's contractors subsequently declared the issue was a City problem, left the worksite thereby leaving the issue to City's IT staff to resolve.

73. Also, during the VOIP implementation at the City Hall Annex it became apparent that the porting of the first 45 numbers required the use of 85 SIP Trunks. Amendment No. 3 of the contract at page 17 provided that City would need 150 SIP Trunks total for VOIP phone implementation.  Based on the number of SIP Trunks used for just one building [City Hall Annex] it became clear Engie grossly underestimated the number of SIP Trunks required for the project, thereby underestimating the overall cost to City.

74. After the porting of the first 45 numbers, City continued to experience problems with Engie's VOIP phone system, to include frequent dropped/disconnected calls and ongoing problems with sound quantity.

75. After four months of repeated failures by Engie to resolve the ongoing issues with its VOIP phone system, on February 27, 2020, out of necessity, City suspended implementation of the VOIP system.

76. As a result of Engie's failures City has had to continue paying the monthly costs for both (1) the legacy AT&T Plexar phone system and (2) the SIP Trunks being used to operate Engie's VOIP phone system at the City Hall Annex while it looked for a different VOIP phone solution.

77. As stated earlier, part of the genesis of this project was for City to achieve the huge cost savings by switching from the expensive traditional "copper-line" phone

service to a VOIP phone system, thereby eliminating the need for City to pay the significantly higher monthly costs for AT&T legacy landline phone and long-distance service.   Thus, Amendment No. 3 of the contract recites, at page 9 that T1 "Upgrade Data Network" component of Scope of Work required Engie to design, supply and install a "data network solution" that "will fully support IP voice traffic, as well as provide reliable transport for City's non-VOIP applications."   The "IP voice traffic" means the VOIP phone system, and the "non-VOIP applications" are all the other "data" transmissions – emails, PDF's, Excel spreadsheets, Word documents, photos, videos, and drawings, plans, etc. that City workers send to each other.   Engie's failure to deliver such a network and subsequent failure to deliver a reliable VOIP telephone system has denied City the savings it was guaranteed.

78. In addition to the hybrid data network Engie designed and caused to be installed not being able to support VOIP phones, the hybrid data network also failed in other areas, to include lacking sufficient bandwidth to support City operations at various locations to include the Southeast Water Treatment Plant, the Wastewater Treatment Plant and the Public Works Complex.

79. Specifically, concerning the Public Works Complex, the fiber-based internet circuit Amendment No. 3 required to be installed at the Public Works Complex and the 50mb speed Amendment No. 3 required for the complex [see paragraph 78 above] was proving to be inadequate to support operations, i.e., the network speed at the Public Works Complex was insufficient to meet City's operating needs.

80. The Third Amendment, at pages 12-14, required to City to acquire 50mb internet from Fidelity for $685.00 per month for the "WWC/WWM Division Bldg. #16" [aka the Public Works Complex].  As previously stated in paragraph 78 above, City did so by entering into a Master Services Agreement with Fidelity on or around April 11, 2017, which included in the service order with Fidelity "Dedicated High Seed Internet Access (HSIA) – HSIA ETHER: 50MBPS/50MBPS" for 2100 SW 6th St Lawton OK 73501 (WWC/WWM Division Bldg. #16) [aka the Public Works Complex] for 60 months at a rate of $685.00 per month.

81. City's decision to enter into the Fidelity service agreement and began paying the aforementioned $685.00 per month was predicated upon representations made by Engie, which are included in Amendment No. 3, that the 50mb bandwidth and fiber circuit would be sufficient to meet City's needs at the Public Works Complex.  City relied on those representations. Those representations were false.

82. Engie, as the expert hired to design, procure, and install the Data Network should have known the 50mb bandwidth City was required to contract with Fidelity for would be insufficient for the needs of the Public Works Complex, and if Engie did not know this then Engie negligently performed its design duties under Amendment No. 3 of the contract.

83. As a result of the inadequate data bandwidth for the Public Works Complex in the Amendment No. 3 of the contract, City, out of necessity, amended its agreement with Fidelity on February 28, 2018 to increase the data bandwidth for the Public

22

Works Complex from 50mb to 70mb. The amended agreement required City to pay $742.50 per month for 60 months for the increased bandwidth.

84. However, even with the increased bandwidth City acquired by amending its agreement with Fidelity, Engie's hybrid data network was still incapable of supporting daily operations at the Public Works Complex on the fiber line that Engie required City to have installed under Amendment No. 3 of the contract.

85. City, again acting out of necessity, had to subsequently abandon the Fidelity fiber line at the Public Works Complex and utilize City's previous wireless method of transmitting data via a microwave antenna in order for the Public Works Complex to obtain sufficient bandwidth for the hybrid data network to function there. However, City is still required to pay Fidelity for 60 months of bandwidth service to the Public Works Complex, a service that due to Engie's faulty design and installation of the hybrid data network, rendered Fidelity's service unusable.

86. City raised the aforementioned bandwidth issues in its May 17, 2019, notice of default letter to Engie.  However, to date Engie has failed to assume any responsibility for those issues.

87. Engie's failure to deliver a data network capable of fulfilling City's needs, to include a VOIP telephone system and subsequent failure to provide a reliable VOIP telephone system constitute a breach of contract by Engie.

88. These failures by Engie concerning the data network and the VOIP phone system began occurring after the execution the Amendment No. 3 of the contract of the contract in 2017 and continued into 2019 and thereafter.

89. As a consequence of Engie's failure to provide the failure to provide the reliable network capable of meeting City's needs, City in 2019 had to cease use of the hybrid data network comprised of the inferior AdTran-brand switches and Juniper-brand servers and replace it with a functioning Unified Data Network at a cost of approximately $1.1 million.

90. As a consequence of Engie's failure to provide a secure, reliable date network and implement a reliable VOIP phone system on said network, City, on or around August 2020, again acting out of necessity contracted with a third-party vendor to provide a hosted VOIP phone solution. As a result, City has had to continue to incur additional costs until the migration City's phone lines to the third-party vendor's hosted system was completed on or around February 2021.

91. As a consequence, with no working VOIP phone system, and an underrated Data Network in the Spring of 2019, the City of Lawton has been damaged: (1) in the amount the City paid Engie for the equipment and installation of an unsecure and unreliable data network incapable of meeting the City's needs; (2) in the amount the City paid Engie for the inoperative VOIP phone system Engie was unable to implement on either its hybrid data network or the City's subsequently installed Unified data network; (3) in the amount of continued AT&T charges the City had to pay after the VOIP phone system Engie was contracted to provide was supposed to have been functional; (4) in the amount the City is having to pay Fidelity for unusable fiberoptic service Engie required the City to obtain; (5) in the amount the City paid to hire a consultant to evaluate Engie's hybrid data network, and then

propose and assist in implementing a solution to the same; (6) in an amount equal to the lost staff time the City incurred due to address issues related to Engie's failure to provide a reliable and secure data network capable of meeting the City's needs, as well as Engie's failure to provide a reliable VOIP phone system; (7) in an amount equal to the cost the City paid to replace the non-functioning unsecure hybrid data network Engie caused to be installed with a functioning and secure Unified data network; as well as (8) a yet to be determined amount for any other damages yet to be identified, the aggregate amount of these damages being in excess of $75,000.00.

**E. Facts related to Engie's default and subsequent breach of the contract concerning the virtual servers.**

92. The "T3 – Server Virtualization" project stated on pg. 30 in the Third Amendment that this project included a *required* monthly cost of $8,500 for: (1) "Private Compute Hosts (Qty – 3 @ $750) - $2,250"; (2) "Tier 2 Storage per GB (Qty – 13,000 @ $0.25) - $3,250"; and (3) Cloud Platform Management - $3,000."  Page 52 of the Third Amendment attributed the $8,500 monthly fee to services being provided by a company named "Quasar."

93. Following the execution of the Third Amendment, the City – acting in good faith and in conformance with the provisions of the Third Amendment - entered into a Master Services Agreement with "Quasar Data Center" [aka Quasar] on or around April 11, 2017, for the services set forth in the paragraph 92.  In accordance with the fees referenced in the Third Amendment, the Quasar agreement required the City to pay Quasar $8,500 per month for five years for these services.

94. After executing the Master Services Agreement with Quasar, the City began paying Quasar $8,500 per month, of which $2,250 is for three private computer hosts a/k/a three servers.

95. In early 2019, the City hired a new IT Director, Gwen Spencer. After Ms. Spencer commenced employment in February 2019, she – as part of becoming familiar with the duties and responsibilities of her new position - began reviewing documents related to the Third Amendment.  During this review Ms. Spencer came across documentation showing the City had paid Engie: (1) $155,026.00 for "Server Virtualization – City-Wide (Equipment)", and (2) $103,351.00 for "Server Virtualization – City-Wide (Installation)". This $258,377.00 the City paid Engie for server virtualization equipment and installation is in addition to the $2,250.00 per month the City is paying Quasar for the same equipment.

96. Based on the aforementioned review it became clear to the City that it is has paid twice for the server virtualization installation and equipment: once to Engie in the amount of $258,377.00 and also to Quasar by way of a reoccurring $2,500.00 monthly fee for Private Compute Hosts, the latter being part of a five-year Master Services Agreement between the City and Quasar.

97. Engie, as the Design Engineer of the project, identified Quasar as the company to implement the server virtualization project and represented to the City the need for the City to independently contract with Quasar for its services. Engie incorporated into the Third Amendment a requirement for the City to incur a monthly cost from Quasar for those services.  However, Engie then also billed the City independently

under the Third Amendment for the servers and their installation, despite the fact it was Quasar who acquired and installed the servers, not Engie.   Engie's representations to the City, on which the City relied, caused the City to pay twice for the servers and their installation, and as such constituted a fraudulent representation to the City.

98. The City raised the aforementioned double payment issue with Engie in its May 17, 2019 notice of default letter to Engie. However, to date Engie has taken no action to correct the double payment issue and therefore remains in breach.

99. As a result of Engie's continued breach in this area, the City has been damaged in an amount in excess of $75,000.

## I.   Causes of Action

### A.  Count 1:  Breach of Contract

100. The City of Lawton realleges paragraphs 1-99.

101. The above alleged acts by Engie constitute events of default under Amendment No. 3 of the Contract. On or around May 17, 2019 the City provided Engie notice of default, setting forth deficiencies with Engie's performance under Amendment No. 3 of the contract. To date, Engie has failed to take any action to cure the deficiencies, and as such Engie continues to be in default.

102. The City of Lawton is entitled to damages for breach of contract in an amount exceeding $75,000.

### B.  Count 2:  Violation of 62 Okla. Stat. Sec. 318.

103.    The City of Lawton realleges paragraphs 1-102 above.

104.   Amendment No. 3 of the Contract, like the original contract, is a "Performance-Based Efficiency Contract" as defined by 62 Okla. Stat. Sec. 318.

105.   62 Okla. Stat. Sec. 318 provides, with regard to a Performance-Based Efficiency Contract, that:

> "The contract's cost savings to the public entity must be guaranteed each year during the term of the agreement. The savings must be sufficient to offset the annual costs of the contract. In calculating cost savings, the public entity may consider capital cost avoidance and include additional revenue that is directly attributed to the performance-based efficiency contract. The contract shall provide for reimbursement to the public entity annually for any shortfall of guaranteed savings. Savings must be measured, verified, and documented during each year of the term and may be utilized to meet the annual debt service. This section shall constitute the sole authority necessary to enter into performance-based efficiency contracts, without regard to compliance with other laws which may specify additional procedural requirements for execution of contracts."  62 Okla. Stat. Sec. 318(B).

106.   Engie violated 62 Okla. Stat. Sec. 318(B) by guaranteeing $626,779 of cost savings during the first four years of Amendment No. 3 of the contract, but wholly failing to deliver any cost savings under Amendment No. 3 and instead – due to Engie's ongoing breach, Engie has caused the City of Lawton to incur additional costs, to include but not limited to: (1) approximately $1.1 million of extra expenses to replace the nonfunction and unsecure hybrid data network provided by Engie, (2) elevated costs for telephone service due to Engie's failure to successfully implement the VOIP phone system it agreed to provide.

107.   The City, in its May 17, 2019 letter, notified Engie that by that point it had become apparent there will be insufficient savings from the projects set forth in

Amendment No. 3 of the contract to satisfy the statutory mandate of 62 Okla. Stat. Sec. 318.

108.    To date the City has failed to realize any annual costs savings from the projects set forth in Amendment No. 3 of the contract, and therefore Engie is responsible to the City for the shortfall in guaranteed savings.

109.    To date Engie has taken no action to reimburse the City for the shortfall in guaranteed savings.

110.    The City of Lawton has been damaged by Engie's violation of 62 Okla. Stat. Sec. 318 in an amount exceeding $75,000.

**WHEREFORE**, the City of Lawton prays for judgment against Engie in an amount in excess of $75,000, together with its attorney fees, costs, interest, and such further relief as the Court deems just.

Respectfully submitted,

*/s/Anton. J Rupert*
Anton J. Rupert, OBA No. 7827
Geren T. Steiner, OBA No. 18845
**RUPERT STEINER, & MORGAN PLLC**
14001 Quail Springs Parkway
Oklahoma City, Oklahoma 73134
P: (405) 607-1495
F: (405) 607-1450
tony@rsm-law.com
geren@rsm-law.com
**ATTORNEYS FOR PLAINTIFF CITY OF LAWTON**